J-A29031-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| Sean P. McCarthy, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| Heather Adams | : | No. 768 WDA 2021 |

Appeal from the Order Entered June 2, 2021
In the Court of Common Pleas of Allegheny County Family Court at
No(s):  FD 18-009106-017

BEFORE:  BENDER, P.J.E., BOWES, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:            **FILED: JANUARY 3, 2022**

Sean P. McCarthy (Father) appeals from the order entered in the Court of Common Pleas of Allegheny County (trial court) maintaining the parties' status quo custody arrangement by granting sole legal custody and primary physical custody of their son F.M. (Child, D.O.B. 5/15) to Heather Adams (Mother) subject to Father's periods of supervised physical custody in Mother's home.  Father challenges the court's refusal to increase his limited award of custody and claims the court demonstrated unfair prejudice towards him during the virtual proceedings.  We affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

**I.**

**A.**

The relevant facts and procedural history of this case are as follows. Child is autistic and attends special education classes with an aid in the classroom. Child participates in counseling and in-home therapy sessions, all of which have been arranged by Mother. The parties divorced in April 2019 and since that time Mother has performed all parental duties and has made all educational and health care decisions. Father has never lived with Child or exercised unsupervised custody of his son.

Father filed a complaint for custody in February 2020 seeking shared legal and physical custody of Child. Father claimed that Mother was overwhelmed by the responsibility of caring for Child given that she suffers from multiple sclerosis (MS) and has been hospitalized in the past. In her March 2020 complaint seeking confirmation of the parties' existing custody arrangement, Mother averred that she has been Child's sole caretaker and that Father has practiced only supervised visits in Mother's home on Sundays from 10:00 a.m. until 12:30 p.m. and occasionally during the week when Child did not have school. Mother alleged that Father behaves erratically and is verbally abusive towards her during the visits and that he has offered to relinquish custody of Child in exchange for financial payment. After attempts to resolve the matter through conciliation conference failed, the trial court scheduled a two-day custody trial.

**B.**

At the May 10-11, 2021 custody trial, the court heard testimony from psychologist J. Anthony McGroarty, Father, Mother and Mother's adult daughter, R.F. Dr. McGroarty had prepared a child custody evaluation report concerning Child and the parties stipulated to his qualifications as an expert witness. Dr. McGroarty interviewed both parents and observed their interactions with Child remotely due to restrictions necessitated by the Covid-19 pandemic[1] and he also administered a personality inventory to them. Child was nearly six years old at the time of trial.

Regarding Child's special needs, Dr. McGroarty testified that Mother accepted the autism diagnosis and that she is dealing with the circumstances as pragmatically as she can by working with professionals to develop skills that she can use with and pass on to Child. (**See** N.T. Trial, 5/10-11/21, at 23). He explained that Mother has not exaggerated Child's special needs and has "learned and utilized every technique suggested to her to give [Child] the opportunity to regulate his behavior and emotions . . . [Father] is only beginning to demonstrate the ability to utilize the techniques." (**Id.** at 25).

Dr. McGroarty described Mother as very cooperative in participating in the evaluation process and opined that the status quo custody arrangement

---

[1] The trial court was operating under emergency protocols approved by the Pennsylvania Supreme Court in response to the pandemic at the time. The custody trial was conducted using Zoom video teleconferencing.

should be maintained, instead of adjusted as requested by Father. Regarding Father's view of Child's autism, he stated: "[Father's] overall belief is that [Mother] essentially caused [Child's] limitations that have been diagnosed as autism because she hasn't offered him enough opportunities for socialization. And [Father's] idea is that if [Child] were with him he would provide many more opportunities for socialization and essentially help him to overcome all of these limitations that he has." (*Id.* at 32). Dr. McGroarty testified that Father blames Mother for Child's autism and this unfounded belief impacts his disconnect with Child and his co-parenting with Mother. (*See id*. at 34). Dr. McGroarty explained that autistic children progress with consistency in their routines and through implementation of parenting techniques targeted at aiding their ability to regulate emotions, effectively plan out their day and avoid confusion.

Father testified that he has been involved in Child's life since he was born and that he has no difficulty handling Child's autism. (*See id.* at 64). Father represented that Mother tries to keep him from seeing Child and has allowed visitation "at her whim every now and then." (*Id.* at 66). He diverted into a sexual description of his relationship with Mother, describing it as a "never ending cat and mouse game" and characterized her allegations against him as an unfair attempt to jeopardize his relationship with Child. (*Id.* at 67). Father expressed concern about Mother's MS because she had previously been hospitalized and was prone to seizures. (*See id.* at 68).

Mother described Father's conduct towards her as erratic, varying with his mood. She stated: "sometimes he is very sexual in his nature. Sometimes he congratulates me about being a good mother and sometimes he is very abusive to me." (*Id.* at 98). A text message Father sent to Mother on May 15, 2020, read: "You're much better to fuck." (*Id.* at 99). Although Mother asked Father to stop this conduct, he continued sending unsolicited graphic text messages. Father also consistently accuses her of "harming [Child's] development [and keeping] him a baby to suit [her] needs and keep [her] MS in remission" and he repeats this allegation to "everyone that will listen," including Child's doctors. (*Id.* at 101). Mother stated that she has done everything in her power to accommodate Child's needs, including scheduling all of his evaluations, participating in therapy, working closely with his school and following all of the professional advice of those that treat him.

Mother recounted two incidents that occurred during Father's visitation with Child on March 14, 2020, and January 3, 2021. Mother's home surveillance video camera footage supported her testimony that Father touched her several times on various parts of her body, including her buttocks while he ignored Mother's repeated requests that he stop. Mother testified that Father whispered "things about my privates of a sexual nature" during the incidents. (*Id.* at 109). Mother also maintained that Father's participation in Child's treatment sessions was not helpful because since his involvement, Child "became more aggressive towards me . . . . It was [] rough to see him

like that when I saw the progress before because he was doing so well before." (***Id.*** at 115).  During visits, Father allowed Child to use the cell phone he gave Child continuously throughout their sessions, which Mother believes is detrimental to his progress.  Mother stated that when Child is home with her on a routine schedule, he does very well, although he struggles with transitioning, anger and aggression.  She opined that a change in Father's visitation schedule would be harmful to Child and averred that she will involve Father and make him aware of Child's progress.  Mother also noted her concern that Father would "fight me every step of the way" if joint custody were granted, especially with regard to Child's autism treatment.  (***Id.*** at 123).

R.F. described Father as verbally, mentally and physically abusive towards her, her siblings and Mother when she lived with him as an eleven-year-old child.  She described Mother as her best friend and a "great mom [who] does everything for [Child.]"  (***Id.*** at 141).  R.F. indicated that Mother's MS was never an impediment to her parenting and that despite some setbacks, Mother has managed her health condition very well for years.

**C.**

On June 2, 2021, the trial court entered its Memorandum and Order awarding Mother sole legal and primary physical custody of Child subject to Father's weekly Sunday visits from 10:00 a.m. until 12:30 p.m. and on specific holidays, including Thanksgiving and Christmas.  The Order provided for Father's ability to communicate regularly with Child by phone or computer and

J-A29031-21

a clause allowing for modification of the custody schedule by mutual agreement. The trial court addressed the custody factors delineated in 23 Pa.C.S. § 5328(a)[2] and specifically credited Mother's testimony regarding the

_____

[2]

**(a) Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where

inappropriate behavior of Father during his visitation periods and found Father "dishonest." (Trial Court Opinion, 8/02/21 at 13; **see also** Memorandum and Order, 6/02/21, at 2-7). The court further found no evidence indicating Mother's health condition hampered her ability to parent Child. The trial court

---

reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a)(1)-(16).

denied Father's motion for reconsideration on July 1, 2021. Father timely appealed and he and the trial court complied with Rule 1925. **See** Pa.R.A.P. 1925(a)(2)(i)-(ii).[3]

## II.

## A.

Father first contends that the trial court's restrictive custody schedule is not in accord with Child's best interests. Father maintains that because he is a fit parent, the order erroneously provides no mechanism for increasing his custodial time with Child and "forever" restricts his ability to form a father-son relationship with him. (Father's Brief, at 33). Father also claims the court failed to provide a reasonable basis for its decision in light of his willingness to actively handle all aspects of Child's autism.

---

[3]

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*E.C.S. v. M.C.S.*, 256 A.3d 449, 461 (Pa. Super. 2021) (citation omitted).

"The primary concern in any custody case is the best interests of the child." **B.S.G. v. D.M.C.**, 255 A.3d 528, 533 (Pa. Super. 2021) (citation omitted). "The best-interests standard, decided on a case-by-case basis, considers all factors that legitimately affect the child's physical, intellectual, moral, and spiritual well-being." **Id.** (citation omitted). When considering a request to modify custody, a court must conduct a thorough analysis of the best interests of the child based on all of the Section 5328(a) factors. **See A.V. v. S.T.**, 87 A.3d 818, 821 (Pa. Super. 2014). However, it is within the purview of the trial court as fact-finder to determine which factors are most salient in each particular case. **See B.S.G.**, **supra** at 535. "The discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned." **D.Q. v. K.K.**, 241 A.3d 1112, 1117 (Pa. Super. 2020) (citation omitted).

Instantly, the trial court explained the reasons for its custody decision as follows:

> [T]his Court did not find it to be in the child's best interest to order a step-up basis [for an increase of visitation with Father]. Father has never exercised any unsupervised custody of the child, who has special needs. During his court-ordered visitations that coincided with the child's therapy, Father was unable to focus on his parental duties and instead behaved inappropriately towards Mother and served as a distraction for the child. Father appears to have a lack of insight concerning the child's special needs, as testified to by Dr. McGroarty, and he blames Mother for the child's autism and believes he can cure the same.

That said, the Order specifically permits the parties to modify the physical custody schedule as they mutually agree. To her credit, Mother has been more than accommodating to Father by continuing to permit his visits in her home despite his inappropriate behavior towards her and his presence serving as a distraction for the child. This court is of the opinion that Mother would agree to increase Father's physical custody should his behavior improve in the future. And in the event Mother does not agree to increase Father's physical custody, there is nothing preventing Father from filing a petition for modification in the future.

\* \* \*

This Court is of the opinion that Father's visits require supervision, not because he poses a danger to the child, but because he is currently incapable of caring for child's special needs. . . . Father has always had limited physical custody of the child. However, rather than spend the visits meaningfully engaged with the child and helping the child to progress in his therapy, Father chose to spend his time berating Mother, groping Mother, and distracting the child. These are not the behaviors of a parent who is interested in caring for his child's special needs. And until Father is interested in caring for his child's special needs, he will be unable to do so effectively.

(Trial Ct. Op., 8/02/21, at 10-11).

The record reflects that the court addressed each custody factor and properly exercised its discretion in focusing on those most salient to the facts and circumstances of this case. The court did not find Father's self-serving testimony that he was willing and able to care for all aspects of Child's needs credible after he failed to do so and instead was content to let Mother take care of since Child's birth in 2015. Importantly, Father also failed to make any progress in developing skills to care for Child during his weekly supervised visits or show any interest in doing the same.

Additionally, as the trial court points out, the custody order affords flexibility for the parties to mutually agree on increased custodial time if Father focuses his efforts on improving his relationship with and ability to care for Child. If Mother does not agree that additional visitation is warranted, Father can seek modification at a later date. Thus, we conclude the trial court acted within its discretion in determining that preserving the parties' current custody arrangement is in Child's best interests. The record fully supports the court's credibility determinations and reflects that it carefully weighed all information available to it in conjunction with the statutory custody factors in making its ruling based on the best interests of Child, and Father's failure to present salient persuasive evidence to establish that modification was warranted. Father's claim to the contrary merits no relief.

**B.**

Father next advances a claim of prejudice in the trial court proceedings based on what he characterizes as the judge's bias towards him. (**See** Father's Brief, at 36). Father maintains that the trial judge intimidated him and exhibited bias against him based on Mother's unfounded testimony that his behavior was erratic and the text messages/videotapes depicting their interactions. In doing so, Father cites to caselaw addressing the general proposition that "the court should be ever so careful not to demonstrate bias or an opinion concerning credibility of a witness . . . in questioning a witness[.]" (**Id.** at 39). This argument fails for multiple reasons.

First, Father fails to cite to any reference in the record at all to illustrate this allegation of bias in violation of our appellate rules and hindering our ability to review his claim. **See** Pa.R.A.P. 2119(c); **see also** Rule 2101. Moreover, our examination of the trial record and court order uncovered no evidence of bias or intimidation of Father whatsoever. To the contrary, as explained in detail above, the record reflects that the court appropriately evaluated the credibility of the parties and carefully weighed the evidence before it. The court also noted that although Father is not presently in a position to care for Child in light of Child's special needs, it acknowledged that Father may acquire these skills if he works on them and stated there is nothing preventing him from seeking modification in the future. (**See** Trial Ct. Op. at 10-11).[4]

Order affirmed.

---

[4] Insofar as Father argues that the trial court did not allow him to confront witnesses during the proceedings, this claim is belied by the record which shows that Father's counsel was given the opportunity to cross-examine Dr. McGroarty, Mother and R.F., and that counsel thoroughly questioned these witnesses. Further, Father noted in his brief that he "appreciates that given the COVID restrictions, that the court scheduled such an important hearing via Zoom," thereby acknowledging any changes in protocol of the proceedings were necessitated by the pandemic. (Father's Brief, at 37).

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  1/3/2022